[No. 2291.]

R. W. LEACHE *v.* THE STATE.

1. PRACTICE—THE "RULE."—The extent to which the "rule" sequestering witnesses shall be enforced is a matter confided largely to the discretion of the trial court, and the exercise of that discretion will be revised by this court only in the clearest cases of abuse. The statutes (Code Crim. Proc., Arts. 662-666) do not exempt expert nor any particular class of witnesses from the operation of the "rule."

2. SAME—EXPERT TESTIMONY.—A rule of practice has prevailed in this State to exempt expert witnesses from the operation of the "rule," and especially has this practice been favored in cases involving the question of insanity, in order that the medical experts may hear all of the evidence of all of the witnesses, so that they may base their opinions as experts upon the actual facts in proof. This doctrine, however, has never been held to defeat the sufficiency of expert testimony based upon the hypothetical statements of the evidence.

3. SAME.—But, whether based upon an actual hearing of the testimony, or upon an hypothetical statement of the same, the expert can state his opinion only upon the *whole* evidence. If the expert has not heard the testimony, each side to the issue has a right to an opinion from the witness upon any hypothesis reasonably consistent with the evidence, and if meagerly presented in the examination on one side, it may be fully presented on the other; the whole examination being within the control of the trial court, whose duty it is to see that it is fairly and reasonably conducted. Note that in this case it is not shown that the hypothetical method of obtaining the opinions of the experts was either defective by not submitting all the facts essential to an intelligent opinion, nor that the opinions were such as would have been given differently had the whole of the evidence been heard directly by the experts, and their conclusions drawn from it, and not from a hypothetical statement of it; wherefore, it can not be held that the trial court abused its discretion by its action enforcing the rule against the expert witnesses. See the opinion *in extenso* on the whole question.

4. SAME—EVIDENCE.—It is a rule of evidence that "an expert may be asked by either party as to the reasons on which his opinion is based; or he may, with leave of the court, give such explanation on his own account. Beyond this he can not go in such examination, though he may be examined in details in order to test his credibility and judgment." An expert witness in this case, testifying upon a hypothetical statement of facts, declared his opinion to be that, at the time of the homicide, the accused was suffering from recurrent insanity, whereupon the defense asked if the witness could give illustrations of recurrent insanity coming within his personal experience, which, upon objection, was excluded. *Held,* that if the action of the court, under the rule stated, was error, it was error without prejudice, and, therefore, immaterial.

5. SAME—INSANITY—CHARGE OF THE COURT.—See the opinion *in extenso* for an elaborate review of the authorities upon the question of insanity, from which this court deduces the following as a correct general conclusion upon the subject: 1. That the law does not require, as the condition on which criminal responsibility shall follow the commission of crime, the possession of one's faculties in full vigor, or a mind unimpaired by disease or infirmity. 2. That the mind may be weakened by disease or impaired, and yet the accused be criminally responsible for his acts; that he can only discharge himself from responsibility by proving that his intellect was so disordered that he did not know the nature and quality of the act he was doing, and that it was an act which he ought not to do. 3. But if, on the other hand, he had sufficient intelligence to know what he was doing, and the will and power to do or not to do it, he is, in contemplation of law, responsible for the act he has committed. Note, also, charges of the court on the question which, harmonizing with the doctrine announced, are *held* sufficient to the exclusion of additional charges upon the subject.

6. SAME—PRESUMPTION.—"If derangement or imbecility be proved or admitted at any particular period, it is presumed to continue until disproved, unless the derangement was accidental, being caused by the violence of a disease. But this presumption is rather a matter of fact than law, or, at most, partly of fact and partly of law. No presumption of continuity obtains in cases of recurrent, fitful and exceptional attacks of insanity. On the contrary, the rule prevails that, if an insane person has lucid intervals, the law presumes the offense of such person to have been committed in a lucid interval, unless it appears to have been committed in the time of his distemper." The trial court properly observed this rule in this case in refusing to instruct the jury in effect that the law presumes insanity to continue after it is once shown to exist.

7. SAME—PRACTICE.—It is essential in criminal cases that objections to the charge of the court as given, or to the refusal of special charges, shall be perpetuated by a bill of exceptions. When such errors are complained of for the first time in the motion for new trial, this court will interfere only when it is manifest that they were calculated to prejudice the rights of the accused. In view of the evidence in this case, such prejudice is not obvious in the failure of the trial court to properly define the offense of cursing in a public place, etc., in connection with the charge

upon the authority of a peace officer to arrest without a warrant for an offense committed within his view.

8. SAME—CASE APPROVED.—Note the opinion for the approval of Jones's case, 13 Texas Court of Appeals, 1, to the effect that, "when an accused relies upon any substantive, distinct, separate and indpendent matter as a defense which is outside of and does not necessarily constitute part of the act or transaction with which he is charged (such as the defense of insanity, etc.), then it devolves upon him to establish such special and foreign matter by a preponderance of evidence. It would not be error to instruct in such cases that the burden of proving such defenses devolved upon the accused."

9. SAME—NEW TRIAL.—Article 779 of the Code of Criminal Procedure provides that "a new trial must be applied for within two days after conviction, but, for good cause shown, the court, in cases of felony, may allow the application to be made at any time before the adjournment of the term at which the conviction was had." The supplemental motion for new trial in this case was made at a term of court subsequent to the term at which the conviction was had, and was therefore properly overruled.

10. MURDER—INSANITY—EVIDENCE—FACT CASE.—To render his plea of insanity available as a defense, it devolves upon an accused to establish his insanity by a preponderance of evidence, to the satisfaction of the jury. See the statement of the case for evidence *held* sufficient to support a conviction for murder in the second degree, despite strong evidense that the accused was insane at the time of the homicide.

APPEAL from the District Court of Comanche. Tried below before the Hon. T. B. Wheeler.

The indictment charged the appellant with the murder of J. N. Martin, in Comanche county, Texas, on the twentieth day of June, 1885. His trial resulted in his conviction of murder in the second degree, and his penalty was affixed at a term of fourteen years in the State penitentiary.

J. B. Hilliard was the first witness for the State. He testified that he knew the defendant and was acquainted with the deceased in his life time. On the morning of June 20, 1885, the defendant came into the witness's store, and engaged the witness in a conversation about failing to send him a chicken that morning, when he sent for it. The defendant was evidently excited and in an ill humor. He picked up a hatchet, which he took with him to a seat on the gallery and proceeded to hack the floor. He presently moved his chair to a position near Doctor Reddin's drug store, took his seat and presently engaged Doctor Reddin in conversation about the failure of the latter to fill his prescriptions. During this conversation the defendant cursed in

o

a loud and angry tone of voice. He soon got up and went down the street, but after a short absence returned to Reddin's drug store, resumed his seat, and reopened his conversation with Doctor Reddin. He cursed Doctor Reddin in a loud tone of voice, and asked Mr. Carter, Doctor Reddin's son in law, if he wanted to take the matter up for Doctor Reddin, adding: "If you do, you can get it." About this time the deceased, J. N. Martin, came upon the scene, and took his seat near the defendant. Defendant asked Martin if he had come to take sides with Reddin. Martin replied that he was not there to take sides with any one, but to keep the defendant out of a difficulty. Defendant replied to Martin: "If you did come to take sides with Reddin, say so, and you can get it d—d quick." The defendant had a knife in his hand at this time, and Martin told him not to handle it so carelessly, but to put it up. Defendant threw the knife to the ground with the remark: "I don't want an advantage over any d—d man." Deceased picked up the knife and placed it in his pocket, when defendant said to him: "When your wife is dying you can run to Doctor Leache." Deceased replied: "I acknowledge it, and would rather have you in attendance upon my family than any doctor in town; and I am under many obligations to you for what you have done for my wife; for you no doubt saved her life." The defendant, who had got to weeping said: "I am not so chicken hearted as to cry about nothing, but you did not treat me right about those pistols,"—referring to a previous difficulty between himself and the deceased. Doctor Reddin finally asked the deceased, who was a peace officer, to take the defendant away, as he persisted in cursing in a loud and boisterous manner in front of his business house. Deceased took hold of the defendant's arm and said: "We must go." Defendant asked deceased to sit awhile longer. Deceased replied: "No, we must go right now." Defendant said that he would not go. Deceased replied: "Yes, you must go; your wife has sent for you twice. I shall treat you like a brother and keep you out of trouble." Deceased tried again to get the defendant to go with him, and, failing, called upon Mr. Shannon to help him carry the defendant home. Deceased took the defendant's left arm, Shannon took his right arm, and they started off with the defendant towards his home. The last the witness saw of the parties, deceased and Shannon were taking defendant home, and he was stopping at intervals in efforts to get deceased and Shannon to take him back to town. Within a

few minutes after they disappeared, the witness heard two shots. Deceased was afterwards brought to town, shot through the stomach; from which wound he died. The deceased was the constable of the precinct.

L. B. Shannon, the next witness for the State, testified that he saw the defendant and the deceased together on the twentieth day of June, 1885. While the witness, defendant and others were sitting in front of Doctor Reddin's drug store in the town of De Leon, in Comanche county, Texas, on the said day, the defendant began to talk about his desire to sell his place and leave that part of the country. He then got to cursing in a loud and boisterous manner, and while so doing, the deceased came upon the scene. Defendant asked deceased if he had come to take up for Reddin and Carter. Deceased replied that he did not. About that time Doctor Reddin asked the deceased to take the defendant off. The defendant refusing to go, the deceased called upon witness to help him take the defendant home. Witness, holding defendant's right arm, and deceased, holding his left arm, started home with him. Defendant begging not to be taken home to his wife in that manner, was released several times, but, as he turned each time to return to town, he was again seized as before, and led forward. The parties stopped in front of the Masonic hall, about four hundred yards from Reddin's drug store, the deceased being on the defendant's left, holding his arm, and witness on his right, but not holding him. While standing in this position, the deceased doing nothing at all but holding the defendant's arm, the defendant pulled a pistol from his right coat pocket and shot the deceased. Witness caught at the pistol, when it was discharged again. Witness then told deceased that he had the pistol, and deceased replied that he was badly shot, and told witness to summon a doctor, which witness did at once. Defendant remarked, "I have shot the d—d son of a b—h, and I wish I had killed him." Witness got the pistol from the defendant while it was in the act of being discharged the third time.

L. W. Carpenter testified, for the State, that he was standing on the porch of the Kee hotel in De Leon on the morning of the tragedy, and saw the deceased and Shannon taking the defendant home. Witness walked to the back of the hotel, and watched the parties from that time until the shooting occurred. The parties were about seventy-five yards distant from the witness when the shooting occurred. Deceased was standing at

the defendant's left hand side, and Shannon to his right, when defendant took a pistol from his pocket and fired it twice, the last shot being fired into the ground, between the deceased's legs. Shannon disarmed the defendant, and witness went down and out of the hotel, and to the place of shooting. Deceased asked witness for God's sake to take hold of the defendant, who was then trying to get the deceased's pistol.from the scabbard, which deceased was trying to prevent. Witness took hold of defendant, and deceased walked off a few steps. Defendant kicked loose from the witness, and started after the deceased, when deceased told witness that defendant had shot him badly, and asked why witness had turned him loose. Defendant said: "Yes, God d—n you, I wish I had killed you." The deceased then told witness and Mr. Downer, who came up, to arrest the defendant, and walked towards the defendant, when the defendant begged him, deceased, not to shoot. Deceased replied: "I am a friend to you. You must not run or I will shoot my pistol over your head." Witness and Downer started with defendant towards his house, and deceased started towards town. When near his house, the defendant called to his wife to bring him his horse, or she would regret it all her life. After passing through his gate, the defendant ran into and through his house, picking up a small pillow as he passed through the hall. Witness and Downer followed him through his lot to a point near where he had his horse staked. Defendant stopped, picked up some stones, faced witness and Downer, and said: "You have come down here to prevent me from escaping. If you cross this road I will kill you." He then turned to his negro boy Andy, and said: "Get my horse and saddle him. I have killed the d—d son of a b—h, and must get away." About this time Mr. Waldrip came up, and defendant ran towards him with a stone, threatening to kill him. Defendant then ran to his horse and mounted him, the horse being still staked. He then called to those present to cut the rope, and, when they refused, he said to them: "You are not friends of mine or you would help me get away." The horse then went rapidly the length of the rope, which stopped him suddenly and the defendant fell off. Dave Carns and John Carter soon arrived upon the scene with drawn pistols. Carter fired two shots and Carns one shot at the defendant, after which his arrest was effected, and he was taken to town, and soon thereafter was transferred to the jail in the town of Comanche.

A. E. Downer testified, for the State, substantially as did witness Carpenter, prefacing his evidence with the statement that he was sitting on the gallery of the Kee hotel when the two shots were fired. When he got around the house he saw the defendant and the deceased struggling for the possession of the deceased's pistol. Carpenter, who had reached the parties, pulled defendant from the deceased. When witness reached the scene deceased told him that defendant had shot him badly. Defendant replied: "Yes, and if I had another pistol I would shoot you again." The shooting occurred about seventy-five yards distant from the Kee hotel.

Doctor J. A. Davis testified, for the State, that he had known the defendant as a physician of De Leon for several years. Defendant was a man of very high temper. Witness saw the defendant and others in front of Doctor Reddin's drug store on the morning of and a short while before the shooting. Defendant was cursing and abusing the people who, he said, had mistreated him in De Leon. He was offering his place for sale and said that he was going to leave De Leon. He then observed some parties to a horse trade a few feet off and declared he could tell the age of the horse. He looked at the horse's teeth and assigned it an age. He then proceeded to curse Doctor Reddin for failing to fill his prescriptions. Carter, Reddin's son in law, came up presently and defendant told him that if he had come to take up Reddin's row he could get it d—d quick. The deceased soon appeared on the scene and defendant told him that if he had come to take the matter up he, too, could get it. When the shooting occurred the witness was in the Baptist church, about one hundred yards distant. On hearing the shots witness soon left the church and in a few moments came in sight of defendant, deceased, Carpenter and Shannon, struggling over something. Deceased came towards the witness and told him that defendant had shot him badly. Defendant said: "Yes, God d—n you, I wish I had a pistol to shoot you again." Deceased then walked off a short distance, returned and told the defendant to surrender, and Carpenter and Downer took charge of the defendant and started with him towards his home. The witness and the deceased then went to McAdam's saddle shop, where the witness probed deceased's wound. The ball entered the left side of the stomach a little below the naval, ranging backwards and downwards. That wound caused the death of J. M. Martin on June 23, 1885.

John Kee testified, for the State, that he was at the Kee hotel on the fatal morning, and saw Mr. Shannon and the defendant when they started from Doctor Reddin's store towards the defendant's house. After they passed witness went to the rear of the hotel and watched defendant, deceased and Shannon until the shooting occurred. The three parties stopped in front of the Masonic building, deceased holding the defendant's left arm, and Shannon standing to his right. Defendant drew a pistol and fired two shots. The first struck the deceased, and the second struck the ground.

Doctor R. D. Reddin testified, for the State, that the defendant came to his store on the morning of June 20, 1885, and engaged the witness in a conversation about prescriptions. He asked witness why he refused to fill his prescriptions. The witness replied to him: "You are drinking; come back some other time and I will talk to you." Defendant went off, and after a time returned and took a seat in front of the witness's store and began to weep and curse. He asked witness's son in law, John Carter, if he wanted to take up the matter. Carter replied that he did not, and defendant said: "If you do, you can get it d—d quick." When the deceased came up a short time later, the defendant asked him if he had come to take it up. Deceased replied: "No, I am a friend of yours, and want to keep you out of trouble." The witness then told the deceased to take the defendant home. Deceased then seized the defendant's left arm and tried to get him to go home, saying to him: "I will treat you like a brother." The defendant pleaded not to be taken home in that manner. Deceased insisted on his going and pulled him up from his chair. Defendant grasped a post and successfully resisted removal. Deceased then called upon Shannon to aid him. Shannon seized the defendant by the right arm and they started off with the defendant towards his home.

Andy Pope testified, for the State, that he was in the employ of the defendant in June, 1885. Witness went into town on the morning of June 20, to get the defendant to go home. He found defendant in front of Doctor Reddin's drug store, talking to Doctor Reddin about prescriptions. Defendant was cursing some. He soon went off towards a saloon. Returning after a short absence, he sat down in front of the drug store and began crying and cursing. He asked Carter if he wanted to take up Doctor Reddin's row, and Carter replied that he did not. Deceased arrived about this time, and took a seat near the defend-

ant. Defendant asked deceased if he had come to take up for Reddin and Carter. Deceased replied that he had not, when defendant remarked that if he had he could get it d—d quick. Doctor Reddin then told the deceased to take the defendant away. Deceased took defendant's left arm and said: "Come, let's go home. Your wife has sent for you twice. I will treat you like a brother." Defendant said that he did not want to go just then, but would go when he got another drink. Deceased told him that he must go then, and pulled defendant from his chair. Defendant grasped a post, and deceased called upon Mr. Shannon to help take the defendant home. Shannon caught the defendant's right arm, pulled his hand from the post, and he and deceased started off with the defendant towards his house. The defendant resisted as best he could, begging not to be carried home in that manner. When a point near the Masonic hall was reached, a pistol was discharged, and the witness ran off. He returned as soon as he saw that. Mr. Shannon had obtained possession of the pistol. The defendant told the witness to go home and saddle his horse, that he had killed the God d—d son of a b—h, and had to make his escape. Carpenter and Downer went with the defendant to his house. Reaching the gate, the defendant ran into and through his house, across his lot and to the place where his horse was staked. Dave Carns, John Carter and Mr. Waldrip soon came up with pistols and arrested the defendant. Defendant was thrown to the ground by the parties who arrested him. Carter pulled him to the ground. Prior to the killing the witness heard the defendant tell his wife that he intended to give his pistol to Grooms to kill deceased. A day or two before the killing, and while talking about the deceased, at home, defendant cursed him, calling him a d—d dog. This occurred between the time of a prior difficulty between the defendant and the deceased, and the killing.

Testifying for the State, John Carter related what occurred in front of Reddins's drug store substantially as the other witnesses did. He added that he saw nothing of the parties after they started off, until after the shots were fired. Witness then went to a point behind defendant's house to arrest the defendant. He found the defendant with stones holding several parties at bay, and when he started towards defendant he rushed upon witness with a stone, threatening to kill witness. He threw the rock, striking witness on the shoulder. Witness then fired his pistol twice, but not to strike defendant. Witness then ran upon

defendant and threw him to the ground, and his arrest was effected.

J. L. Pettit was the next witness for the State. He testified that about a week before the homicide the defendant and one Grooms came into a saloon where deceased then was. Deceased and Grooms had had a difficulty before that. A few words, which were not heard by witness, passed between defendant and deceased, and deceased then said : "I thought that thing was settled, but if it is not I can satisfy you." Deceased then procured two pistols from behind the bar, extended them towards defendant, and told him to take his choice. Defendant refused to take one, when deceased offered them to Grooms, defendant's friend, and Grooms likewise refused to select one and left. Defendant left the saloon a few minutes after Grooms did. Grooms testified substantially as did Pettit, and the State closed.

Mart Howell was the first witness for the defense. He testified that he was at Reddin's drug store on the morning of June 20, 1885, when the defendant got there, and he heard and saw all that transpired. Defendant asked Doctor Reddin why he refused to fill the prescriptions. He then told Reddin that he was a good old man ; that he would not hurt a hair of his (Reddin's) head, but that if he had a son in law who wanted to take the matter up, he was ready for him. About this time, John Carter, Reddin's son in law, came up and said he did not want to have any thing to do with the defendant. While talking to old man Reddin the defendant wept and cursed loudly. Defendant presently left, going towards Martin's saloon. He soon returned and resumed his seat at the drug store. He then proceeded to twirl a knife carelessly about, and to talk about and curse the people about De Leon, who, he said, had treated him badly and tried to starve him and his family. About this time the deceased came up, and the defendant proceeded to tell him how he had been treated by the people of De Leon; that every body was down on him and trying to starve out him and his family, and that the druggist would not fill his prescriptions, and that he had no medicines. Deceased replied that he was the defendant's friend; that he had twenty-five dollars at the service of the defendant, with which the defendant could get his medicines at Rising Star. The defendant replied that a lawyer had told him he could get those drugs, and that he knew the deceased was his friend. At this time the defendant was cursing parties about De Leon, and flourishing his knife somewhat carelessly. Deceased

advised him to put up his knife, as he might cut some body. Defendant thereupon threw his knife upon the ground, and said: "D—n the knife ; if you want any thing you can get it." About this time Doctor Reddin came to the door of the drug store and told the deceased to take the defendant away. Deceased proposed to defendant to go with him, and the defendant refused. He got up from his seat, and deceased caught at his left arm, and defendant put his right arm around a post and said he would go when he got another drink. Deceased then called on Shannon to help take the defendant home, and Shannon took the defendant's right arm, and the parties started off, defendant crying and begging deceased "for God's sake and for my sake, don't take me home to my wife in this condition." Deceased and Shannon took the defendant about four hundred yards and stopped, when a scuffle, in which two shots were fired, ensued. Witness then saw Shannon holding what he took to be a pistol above his head, and soon start back towards town. Two men then ran up and took hold of defendant, and the two men with the defendant went towards the defendant's .house, and the deceased came back towards town. A crowd soon followed after the defendant, and the witness next saw the defendant after his arrest Witness heard some one tell defendant that he had killed Martin, when defendant placed his hands to his face and exclaimed: "Oh, my God ! my God ! I told him not to do it!" Camp, Thornton and Coen, witnesses for the defense, testified substantially as did the witness Howell.

Dave Carns was the next witness for the defense. He testified that he was the bar keeper in the saloon owned by John Pettit and the deceased. The witness first saw the defendant and the deceased on the day of the shooting, as they came to the saloon together from the direction of the railroad depot, just after the train from Cisco got in. They took a drink together, and Mr. Alexander Tuggle told the defendant that his, Tuggle's, wife was quite sick and needed defendant's attendance. Defendant replied that he was not then in a condition to pay a professional visit, but would see Mrs. Tuggle after he had gone home and taken a nap. Defendant then went up the street. He soon came back to the saloon and entered it with deceased, walked with him to the bar and asked witness if his face was good for the drinks. Witness replied affirmatively, and started to mix the drinks, when he noticed that the defendant was crying. Deceased asked him: "In the name of God, Doc., what is the

matter?" Defendant did not reply, though the deceased asked the question several times, but swallowed his drink and walked out. Witness suggested to deceased that he had better follow defendant and see what trouble he was in.

The next that the witness saw of the defendant was in the hollow behind his house. Fifteen or twenty men, including the witness, composed the party that went there to arrest the defendant. Witness, John Carter and Waldrip had pistols. When the witness got near the defendant the latter fell off his horse, which was still staked to a stump with a long rope. He got up and confronted the party with stones, with which he threatened to kill them if they approached him. He threw one stone, which struck Carter. Witness and Carter then fired. Defendant, in backing from the party, fell. The party then rushed upon and secured him. Defendant appeared very much excited while under arrest. Witness often saw the defendant and the deceased together after the day on which it was said they had a difficulty. They associated together, drank together, and appeared to be good friends.

Andy Green testified, for the defense, that he saw the defendant and the deceased together in the town of Cisco, on the nineteenth day of June, 1885, and traveled on the same train with them from Cisco to De Leon, on the twentieth, the day of the shooting. They appeared to be good friends.

W. A. Hawks testified, for the defense, that he was a brother in law of the defendant, and lived in the city of Baltimore, Maryland. The last time the witness saw the defendant, before seeing him in the Comanche county jail, was in the city of Baltimore, in the year 1878. He then came to the witness's house during the night and went to bed. He got up in the night and walked all about the house, and acted so strangely that his sister, the witness's wife, became afraid of him, and directed witness to request him not to come back to the house. The witness did so, and he moved to a boarding house. Within a few days the proprietress of the boarding house sent for the witness and required him to remove the defendant from her premises, as he was acting too badly to be entertained. She said, among other things, that the defendant had threatened to burn her house. Witness went to the defendant's room and found him asleep, evidently under the combined influence of whisky and some drug. Of the three hundred dollars he had when he left witness's house, a few days before, the witness found but twenty

dollars on his person. Witness got the defendant away from the boarding house, and finally succeeded in getting him on the train to take him to his home at Manassas. Defendant made several efforts to jump off the train, and to push or throw the witness off. His condition was so bad that, when the train reached Washington City, the witness was compelled to get off and get him some whisky. Defendant spent nearly four months in Baltimore, during which period the witness saw him as often as twenty times, and on each of those occasions the defendant was under the combined influence of whisky and a drug of some kind. The witness believed then and believed yet that the defendant was then insane.

Eugene Leache, the defendant's brother, testified in his behalf that in 1883 he lived in the town of Duffau, in Erath county, Texas. The defendant visited the witness during that year, and a few days after his arrival began to show symptoms of a disordered mind. He became gloomy and despondent, and soon began to drink whisky and take morphine. In a very few days he became perfectly wild and unmanageable, and had to be placed under constant guard, day and night. He was kept under treatment about four weeks, during a part of which time he occupied a cot and slept in the back room of Cole's drug store. He frequently left the drug store in a perfectly nude condition, and had to be pursued and brought back. It was almost impossible for a time to keep clothes on him. He often employed himself tearing the paper from the walls, thrusting his hands through the glass windows, and pointing to tacks on the canvas and speaking of them as being crooked. Again he would fall to the floor and squirm and twist about violently, and could hardly be held by force. He would alternately rave and remain mute for a while, but kept up the motion of his body all the time. He complained all of the time of great pain in his head. During the fourteen days of his greatest violence, he was under the care of Mr. Dozier, refusing to see or to tolerate the presence of his wife, or of the witness. He could only be quieted by large doses of morphine and whisky. Witness had often seen the defendant's bare legs and arms, which were punctured all over by the needle syringes used in hypodermic injections of morphine. Those injections produced a number of sores on his legs.

Leaving Duffau, the defendant went to Hico, where he stayed a short while. Thence he went to Gatesville, and thence to De Leon, the scene of the killing of Martin. The witness saw the

defendant twice after the Duffau experience, once at his home in De Leon and once at Hico. He was violent on both of those occasions, and would not tolerate the attentions either of his wife or the witness. The extreme violence of the attacks in each case was counteracted by the administration of large doses of morphine. The witness considered the defendant insane at Duffau, and did not think he had ever been mentally sound since.

G. W. Tabor, A. W. Mims and T. J. Dozier, confining their testimony to the defendant's attack at Duffau in 1883, corroborated the witness Eugene Leache, in every substantial particular, and declared that in their opinion the defendant was then insane and drunk on whisky.

M. S. Beach testified, for the defense, that he lived in Duffau in 1883, when that town was visited by the defendant. The defendant's reputation as an expert in the management of horses preceded his advent in Duffau, and, having a favorite colt to break, the witness went to see defendant, and solicit advice, soon after he arrived. Witness found defendant reading a book with apparent great interest. He told defendant his business, when defendant rose from his chair with a peculiarly shaped knife in his hand. He indicated a certain place on the blade, not far from the point, and remarked: "I don't think that much blade would kill a man; do you?" Witness replied: "I hardly think it would." He then slipped his thumb a little farther toward the handle, and remarked: "I don't think that *that* much would kill a man either; but," slipping his thumb farther down, "I think *that* would." Witness told defendant he would call about the horse matter at some future time, and left immediately. The defendant's conduct induced the witness to believe that he was "not all right," and that he was a man of a mean, disagreeable disposition.

J. B. Cole testified, for the defense, that, in 1883, while he, witness, was keeping a drug store in the town of Hico, he met and formed the acquaintance of the defendant. Defendant's peculiar appearance struck the witness at first sight, and his first question, about a stove, the witness not being in the stove business, as the defendant could readily perceive, impressed the witness as a singular one. When defendant called at witness's drug store the second time, he said that he intended to practice medicine in Hico, and would like to make witness's drug store his head quarters. Witness declined to make room for him.

Witness refused because defendant did not look to him to be all right, and witness did not think he could get along with him.

T. J. Jennings testified, for the defense, that he had often seen the defendant prior to the killing of Martin. Defendant often appeared gloomy and despondent, and at such times would protest that he had no desire to live, and that he saw nothing in life worth living for. On one occasion the witness remarked that he would like to live a thousand years and defendant replied that to think he would live so long would render him unhappy. The defendant was a very strange man. He was a man whom the witness considered mentally unbalanced. He was in the habit of getting on sprees. When sober he appeared rational and natural, but high tempered.

Doctor H. M. Brown testified, for the defense, that he had considerable experience in the treatment and study of mental diseases. Basing his opinion upon the whole of the evidence in this case, as detailed by counsel on either side, the witness thought the defendant was insane when he shot Martin. The act, he did not believe, was the act of volition on defendant's part.

Doctor D. R. Wallace, superintendent of the North Texas Insane Asylum, was the next witness for the defense. He qualified himself as an expert in the care and treatment of diseases of the mind, and testified that he had examined the defendant. He found defendant's temperament to be of the nervo-bilious type, the type which constitutes the morphine eaters of society. The discontinuance of the use of morphine on the part of the defendant would, in the opinion of the witness, imperil the defendant's life. The witness declared the defendant insane and that his insanity was of the recurrent type. If in witness's charge as the superintendent of an asylum the witness would not consent to the discharge of the defendant. Basing his opinion upon the entire evidence in this case, as stated by the counsel on either side, the witness declared that, in his opinion, the defendant was insane when he fired the fatal shot, and that he has been insane throughout the entire time covered by the testimony. At this point the witness was asked what was the cause of the defendant's complaining of the buzzing sound in his head, and of hearing false voices and screams of distress. He replied that such a condition indicated a brain lesion. A brain lesion was a permanent change of the substance of the brain

and was incurable, creating a case of hopeless insanity. The defendant had a brain lesion.

Mrs. J. W. Leache, the defendant's step mother, testified, in his behalf, that she lived in the State of Virginia, and had known the defendant since he was twelve years old. When at the witness's house, in the year 1879, the defendant became perfectly insane. During the violence of that attack he knocked his wife down and dragged her over the house, tearing off the sleeve of her dress. He then rushed into the yard, secured a club, and was about to brain his five year old son, and was prevented from doing so by the interposition of the witness. Witness afterwards found him in his room, standing with his knife drawn, over the crib containing his thirteen months old baby. Witness seized the child and fled with it. Defendant then ran down town with an open knife in each hand, and proceeded to destroy property with great recklessness. He was arrested and confined in jail, being mad and drunk on whisky. On his release he went to the house of a neighbor, refusing to see his wife. When, after several days, his wife sent her little boy for him, he came back by the house, said that he was going off, and left with the little boy riding on his horse before him. He returned that evening, and said that he would enter the house if his father would leave it. Informed that his father was not at home, the defendant went up stairs, but would not see his wife for quite a week, at the end of which time he sent for her. A day or two later he said to his wife: "Come, May; get up the children and let's go. They are getting tired of us staying here," and he and his family left for Texas. During this attack, which lasted about two weeks, the defendant was unquestionably insane. When in possession of his faculties, he was a most devoted husband and father. When out of his mind, he could not tolerate the presence of either his wife or brother, the two persons whom he most loved. The witness personally knew two of his relatives on his mother's side who were insane, and at the present time were inmates of the lunatic asylum at Staunton, Virginia.

J. P. Groom testified, for the defense, that about a week before the killing of Martin, he met the defendant and told him that he, witness, had a pistol at Martin's, and as he and Martin were not on good terms, he asked defendant to redeem it for him, he giving defendant a five dollar bill with which to do so. Witness and defendant went into the saloon together and called for drinks. While they were being prepared, defendant put the

bill on the counter and asked for the pistol. Martin took the bill and threw the pistol to the witness, and not to defendant. Witness and defendant took their drinks and left the saloon together.

Doctor J. W. Leache, of Virginia, the father of the defendant, testified, in his behalf, that he had observed striking peculiarities in the defendant since his earliest boyhood. Defendant would often refuse to play or associate with other boys, and spent a great deal of his time in sullen despondent solitude. The witness had always regarded defendant as the brightest of his children. Defendant had been a great sufferer all his life, and was once thought to be dying from consumption. He had always suffered from severe pains in his limbs. He had often been brought to witness's house with his health shattered. Defendant went to Baltimore in 1878 or 1879 to attend medical lectures, but was brought back in a short time by his brother in law, A. W. Hawks. At this point the witness detailed the acts and conduct of the defendant at his house in Virginia in 1879, just before he came to Texas with his family, substantially as did Mrs. Leache, adding that, when defendant ran out of the house in pursuit of his little son, the mucus was running from his nostrils to his chin, and he had every appearance of a mad man. He was completely under the influence of whisky on that occasion. The witness was intimately acquainted with the defendant's family history, and knew that six of his maternal relatives were insane. Two of his first cousins were now insane inmates of the Staunton asylum. Defendant had one cousin who was a man of scrupulously temperate habits. He indulged in whisky on but one occasion in his life, became insane from the one debauch which followed, is insane at this time, and has never been sane for a single moment since he took that first drink. That cousin was twenty-two years old when he took that first drink and went crazy. The witness was seventy-seven years of age, and had been a practicing physician and surgeon for fifty-five years, during which period he had had a great deal of experience with diseases of the mind. The witness was satisfied, from his knowledge of the defendant, and his medical experience, that the defendant was insane.

Mrs. R. W. Leache, the defendant's wife, testified, in his behalf, that she was married to the defendant in the State of Virginia about twelve years prior to this trial. The defendant had been a great sufferer ever since the witness had known him,

during which time his life has often been despaired of. The suffering which attended one of his attacks was so great that he could not endure it without an opiate, and it was administered. The witness did not know, nor did she believe, that defendant had ever been addicted to the use of narcotics up to that time. During his recovery from that attack it was found that morphine was an absolute necessity to his existence. It was commenced by hypodermic injection, as his stomach would retain nothing. The witness knew that the defendant contracted the morphine habit during that illness. He always afterwards, when sick, resorted to morphine for relief. Always before his attacks, the defendant became gloomy, morose and despondent, and invariably complained that every body was against him, and that he did not want to live longer. This witness then spoke of the scene at Doctor J. W. Leache's house in Virginia, in 1879, and described it as Mrs. Leache did. From Virginia defendant, witness and their children came to Texas, stopping first at Duffau, where the occurrences related by Eugene Leache, Mims and Dozier transpired. Thence defendant, witness and family went to Hico; thence to Gatesville, and thence to De Leon, the scene of the killing of Martin. The witness frequently prevented the recurrence of the condition to which the defendant was reduced in Virginia, and at Duffau, by administering heavy doses of morphine and inducing protracted sleep. The premonitory symptoms of his recurring malady were despondency, gloomy forebodings and imaginings, occasioned by complaints of buzzing about the ears, hearing strange voices, and pains in the head. The attack in Duffau was not due to drunkenness, but whisky was prescribed and administered to him. He was very weak during the Duffau attack, and ate nothing. He complained of being unable to see, and he was taken out on a gallery, his eyelids raised to admit the full glare of the sun upon his eyes. The sun apparently made no impression upon his eyes. The attacks of depression were always preceded by an unnatural glare of the eyes, and this glare always preceded any indulgence in drink.

Defendant did not, as a rule, drink liquor until his spells of depression threatened him. He would then tell witness that his mind was slipping from him, and ask for something to help him. He had an attack about two months before the killing of Martin. He seized a pistol and said that he felt like and wanted to shoot witness and then himself. Witness soothed him, and, by keep-

ing her eye fixed closely upon him, approached him, got his pistol, and slipped it under the sewing machine, without the defendant observing or realizing what she did. Witness then gave him a heavy dose of morphine and got him to sleep. After sleeping awhile he sprang up, got a towel and some hot water, and proposed to wrap his head up. He then ran out to the stable, got in the loft and remained there until witness sent for him. Mr. Martin came in, and, observing that the defendant was very cold and weak, remarked: "I believe the Doctor is dying." If he had any liquor on that day the witness did not know it. It was Sunday, and he had been from home but thirty minutes during the day. That attack covered a week in duration.

The witness, continuing, said that in November, 1884, the defendant received a blow on the head with a club, which, according to the doctor attending upon him, produced concussion of the brain. From that time the defendant claimed that, in addition to the voices and buzzing sounds, he heard screaming as of some one in distress. Doctor Wallace of Comanche treated the defendant for the wound on the head. Defendant's spells frequently followed long and weary watches over his patients. An attack followed his attendance upon Mrs. Martin, the wife of the deceased. In addition to the morphine which he took while attending upon Mrs. Martin he took some whisky which he said Mrs. Martin gave him. On his return witness saw that an attack was imminent. She gave him a heavy dose of morphine and got him to lie down, but he soon got up and said that he was going to Cisco with Mr. Martin, and would be back next day. He asked witness to go to see Mrs. Martin and stay with her as much as possible while he was gone. Witness begged him not to go, gave him some more morphine and got him to lie down again, hoping the train would pass. One of the children, however, came into the room and aroused him, and he left, taking a vial of morphine with him. On the arrival of the train on the next day witness sent her little son to town to see if the defendant had got back. The little boy came back without his father. Witness then sent Andy Pope to town, and presently concluded to go after him herself. Just as she was starting she saw Shannon and Martin dragging the defendant towards the house. Defendant was hanging to them with his knees on the ground. A scuffle ensued, and soon a pistol was discharged twice. Shannon then left, and defendant stood still, holding his pistol in his hand high above his head. Witness went to the parties, and, with

Downer and Carpenter, accompanied the defendant to his house. She observed defendant closely as he passed through the gate, and knew that he had not the least realization of what he had done, or what had occurred. His appearance indicated complete unconsciousness. When he saw the crowd of men approaching on the hill the appearance of his eyes changed and he seemed transformed into a wild man. He fled, followed by Carpenter and Downer, through the house. He picked up a small pillow in his flight through the hall. With the pillow he turned and threatened Carpenter and Downer, until he reached his horse, which was staked to a stump with a long rope. He mounted his horse, from which he fell when it reached the end of the rope. The remainder of this witness's testimony as to what occurred until defendant's arrest harmonized with that of previous witnesses. She stated, in addition, that it was not true that defendant ever cursed deceased in witness's presence, or called him a dog, or said that he was going to give Grooms a pistol to shoot the deceased.

Doctor S. A. Wallace testified, for the defense, that he saw the defendant when the latter was suffering from a blow on the head which caused concussion of the brain. Witness always thought and said that defendant's mind was unbalanced. He could not say that he was actually insane, but witness was not an expert on diseases of the mind. It was evident to the witness that when the defendant was placed in jail in Comanche on the day of and after the killing, he was under the influence of an opiate.

Doctor C. F. Paine testified, for the defense, that since he had known the defendant he had regarded him as more than ordinarily able as a physician, but one of the most eccentric and peculiar of men. Defendant was evidently under the influence of an opiate when placed in the Comanche jail for this offense. Witness had attended him since, and, though he had reduced the doses of morphine given him, he had never discontinued the use of the drug. Witness had never considered the defendant insane, but did not consider himself an expert on mental diseases.

The motion for new trial raised the questions discussed in the opinion.

*Pearre & Boynton,* for the appellant: No question in criminal law is involved in so much doubt as the question of insanity, accompanied with the presumption of the sanity of the defend-

ant. Let us look at this presumption and this question in connection with the statement of facts before us and the charge of the learned judge in the court below.

Justice Best, in speaking of the presumptions of law, says: "It is not always possible for man to arrive at a perfect knowledge of the truth in each particular case, and yet social necessities do not always allow him to suspend his judgment and refrain. The stability of the state of person and property—in a word, the want of peace and security for a multitude of precious interests—compel the legislator (or judge) to hold as true a great number of points which are not demonstrated, but whose existence is established by an induction more or less cogent." And again: "Perhaps if we lived a thousand years, instead of sixty or seventy, it might throw light on any subject that came into dispute if all the matters which could by possibility affect it were severely gone into and inquiries carried on from month to month as to the truth of every thing connected with it." (1 Best Ev., sec. 42.) Mr. Greenleaf says: "Such presumptions are rules which in certain cases either forbid or dispense with ulterior inquiry." (1 Greenl. Ev., sec. 14.) And another famous law writer, in speaking of the distinction between presumptions of law and fact, says: "In case of presumptions of law, the court may draw the inference wherever the requisite facts are developed in pleading." (Stephen's Pleading, 4 ed., 382.)

Enough has been said to establish the principle that presumptions of law are general, not special, and are inferences drawn by the judge upon the assumption that certain facts which are unproved nevertheless exist.

One of these presumptions of law is that a man placed upon trial is sane; but this we all know is not necessarily the fact, for some men are insane. Still, as the large majority of men are of sound mind, the court may infer generally that the particular individual on trial is one of the large majority of sane men. This presumption is only indulged to save time and to remove the necessity of proving a line of facts which must necessarily be the same in nearly all cases. The issue is determined by a settled presumption of law, founded on the existence of an undisputed state of facts, i. e., the elements of sanity in the defendant. But suppose the facts, i. e., the existence of these elements of insanity in the appellant, are not admitted; suppose testimony is produced to show the existence of insanity, can we any longer use the presumption of law that the defendant is

sane? Is not the issue then removed from the bench to the jury box, and can a presumption of law follow it where the only issue which can be decided is one of fact? The presumption only acted and controlled when the fact that the appellant was one of the vast majority of sane men was not questioned; but now that fact has been disputed, the presumption of law retires, leaving the jury to determine the issue of the sanity or insanity of the defendant from all the evidence in this particular case. (1 Crim. Law Mag., 32.) The presumption had never been spoken as to this particular man, but only as to men generally, supposing this individual to be one of the general class of sane men and not one of the exceptional class of insane men. Now the fact as to whether the prisoner is a general or an exceptional man as regards sanity has been controverted and the presumption can no longer act.

When the issue of fact is raised and the whole question of sanity or insanity passes to the jury to be decided from the evidence alone, it becomes of first importance to define, in clear and unmistakable terms, of what the insanity which frees from criminal responsibility consists. And here, with all the aid that science and the medical profession can give, we are still among the breakers, still unable to make the division line with any degree of clearness, for the forms of insanity vary as widely as the mental powers and scope of more fortunate beings. But modern research has at last cleared away some of the mists and left only two or three propositions to discuss.

Three different views have been taken by modern courts and one of the three is undoubtedly correct: First. We have the theory that there must be complete loss of the knowledge of right and wrong as to the particular act, to indicate that degree of insanity. Second. Again, it is said, that loss of the knowledge of right and wrong, together with an uncontrollable impulse to commit the act charged, is the true test. Third. The last view is, that the existence of an uncontrollable impulse to commit the act, without regard to whether or not the appellant had the knowledge that it was a wrong and unlawful act, is the test which justice and humanity demand. In other words, the test of knowledge; of knowledge and power combined; and, last, of power alone. Which is right must be determined outside of the realms of law and in the domain of science. It is to medical experts and those accustomed to the insane, rather than to lawyers and courts, that we must turn for information. (State v.

Jones, 50 N. H., 369, reported in 9 Am. Repts., 242.) Doctor Or-
dronaux says: "A knowledge of right and wrong is possessed
by the majority of lunatics as a class; its absence is exceptional.
It can not, therefore, be any test of their power of controlling
their conduct any more than of controlling their disease. \* \*
The only test of their criminal responsibility is their capacity to
choose *not* to do an act, to which they are impelled by disease,
coupled with the power of enforcing obedience to that choice."
(Judicial Aspects of Insanity, p. 34.) The famous Doctor Conolly
said, in Queen v. Pate, that the prisoner was of unsound mind,
but that he did not suffer from any particular delusion, and that
he was well aware that he had done wrong and regretted it. At
the annual meeting of the British Association of Medical Offi-
cers of Asylums and Hospitals for the Insane, held in London,
July 14, 1864, fifty four medical officers being present, it was
unanimously

"*Resolved,* That so much of the legal test of the mental con-
dition of an alleged criminal lunatic as renders him a respon-
sible agent, because he *knows* the difference between right and
wrong, is inconsistent with the fact, well known to every mem-
ber of this meeting, that the *power* of distinguishing between ·
right and wrong exists very frequently among those who are un-
doubtedly insane, and is often associated with dangerous and
uncontrollable delusions."

In the famous DeJarnette case, tried in Virginia in 1881, Doc-
tor Grissom, superintendent of the asylum for the insane at Ral-
eigh, N. C., in regard to the defendant in that case, said: "He
committed the act on account of a diseased condition of the
brain, in my judgment; which so impaired his will power that
he was not capable of restraining himself under any combin-
ation of exciting causes."

The whole tendency of modern thought and decisions is to
hold that while there may or may not be a knowledge of right
and wrong as to the particular act committed, if there exists
this uncontrollable impulse to do the deed, the accused should
be acquitted, and the act declared that of an insane man. This
view was, we think, overlooked and neglected in the charge
before us. The learned judge, in instructing the jury as to the
degree of insanity which negatives the idea of crime, and later
in the charge, when touching on the question of a partial insan-
ity which would not excuse, failed to give this test of power as
the law. It is true that in other portions of the charge this

"uncontrollable impulse" is referred to, but in these two vital sections, which give to the jury the different degrees of insanity which will and which will not excuse from punishment, it is entirely lost sight of; and this, we think, was error.

After having decided what the "presumption of sanity" truly means and its real use, and also the enlightened test as to what is the necessary degree of insanity to excuse from punishment, we have the facts spread out before us and must determine what proof and how much is necessary to establish insanity in the defendant. This amount we think to be sufficient, if it raises in the minds of the jury a reasonable doubt as to the prisoner being one of the general class of men (i. e., sane men), for then it has retired the presumption of law, and the question is merely one of fact to establish an element of murder (sound memory and discretion), and here the burden is always on the State. To illustrate: When a killing is shown and the defendant is proved to have done the deed, the law implies (presumes) malice; but let the defendant introduce testimony to show a killing "under the influence of sudden passion arising from an adequate cause," and the court instructs the jury that if they have a reasonable doubt as to the defendant being guilty of murder in the second degree, they will acquit him of that charge, and consider as to whether or not he be guilty of manslaughter; in other words, the implication or presumption of malice retires just as soon as we enter into the facts as to the evidence of malice in any particular case, and the burden of proving it is an element of the crime, by negativing the existence of "sudden passion arising from an adequate cause," rests upon the State. Are not the positions parallel; are not both general presumptions that make no pretense to knowledge of the facts in the particular case under consideration? Do they not both assume the existence of a certain state of facts under which they can apply; in the one case that this is one of the general class of killings—malicious killings; in the other, that this is one of the general class of men—sane men? We maintain that the burden of proof is as much upon the State in the latter as in the former case, and that the charge in the court below on this point was not the law.

The testimony before the jury on the question of insanity extended more or less over the life of the defendant since his twelfth year, and touched upon the insane condition of some of his near relatives, and there is undisputed testimony to the fact that he was violently insane during many periods of his life.

There was not an iota of evidence to show a lucid interval during this whole period, not a suggestion that these sad and shocking scenes were not the outburst of a volcano of disease continually struggling for dominion, and always ready, on the slightest opportunity, to force itself into the chair of reason and scatter destruction on every side. No intimation that the defendant was ever able to control himself under strong excitement; not a scintilla of proof that he had ever done so.

Under this state of facts the defendant's counsel asked for a charge to the effect that insanity, once proven, was presumed to continue until evidence was introduced tending to show the contrary, and that the jury should consider the whole evidence and determine whether the defendant was ever insane, and if so, consider whether or not a rational period had been shown. Here we have another presumption of law founded on the assumption that this defendant belongs to the general class of insane men, that is to say, once insane they so continue. A presumption applicable only to an assumed state of facts, in the absence of evidence as to what the facts in this particular case really are. But in the case before us no evidence was introduced as to whether this defendant had experienced any mental change, and yet the court limited the jury in their consideration of the evidence relating to the defendant's past life simply to its bearing upon his mental condition at the time of the homicide. When properly understood, this is the law; still, in the case before us, should it not have been explained by the charge asked by defendant's counsel? When we consider the overwhelming weight of the testimony in favor of the defendant's previous insanity, must we not decide either that the defendant was tried by a prejudiced jury, or that they were misled by the charge? Does it not clearly appear that if there had been evidence to convince the jury that, an hour before the homicide, the defendant was violently insane, under the charge of the court they would have felt bound by their oaths to convict unless the defendant introduced further evidence to show his insanity at the very moment at which the shooting occurred? Did not the charge, when directing the jury to consider the acts of the defendant before the homicide, limit them in the application of this testimony to a kind of personal knowledge of the defendant, so that they might judge as to his sanity when the homicide occurred by his acts at that time compared with former periods of his life, without allowing them to consider whether or not the appellant was insane at the time

covered by the testimony, and whether if they so thought him to have been insane, any evidence had been introduced showing a permanent change or a lucid interval? We think the refusal to give this charge was error.

But suppose we admit for the sake of argument that the true principle is to require of the defendant a preponderance of evidence as to his insanity, can we even then understand this verdict? Did not the court instruct the jury that the defendant only needed to prove his insanity by a preponderance of the evidence? To do this the defendant puts his relatives and acquaintances one after another on the stand, and they all tell the same sad and horrible story of his wild, insane ravings, his attempts to kill those nearest and dearest to him, and his entire loss of self control. Then, to make assurance doubly sure, the defendant's counsel call upon Doctor H. W. Brown, of Waco, and Doctor D. R. Wallace, superintendent of the North Texas Asylum for the Insane, two men of more than State reputation on this most difficult question of insanity, and they testify directly and positively that the defendant has been insane for years, and was unquestionably insane at the time of the homicide. Did the defendant not fully make out his plea? Must we not decide either that the jury disregarded the highest and best evidence which could be produced, or were overawed by the popular clamor for the life of the unfortunate defendant? Who, unswayed by prejudice, and unmoved by the general excitement caused by an apparently cruel murder, can view the clear, strong and uncontradicted evidence upon this point and say that the defendant failed to make out his case? A new trial should have been granted. (Bond v. The State, 23 Ohio State, 349; Webb v. The State, 9 Texas Ct. App., 491; 7 Metc., Mass., 500; Coyle v. Com., 100 Pa. St., 573.)

Still, admitting in the argument that the burden of proof is on the defendant to establish his insanity, we meet the question of a "lucid interval." The show that the homicide took place while the defendant was enjoying one of these occasional periods of reason is a burden imposed upon the State whenever the defendant has introduced evidence of insanity, unless the mental unsoundness is caused by some temporary and extrinsic cause. (2 Bouv. Dic., 15 ed., "Lucid Intervals;" 1 Greenl. Ev., sec. 42; State v. Sewell, 3 Jones, L., 245; White v. Wilson, 13 Ves., 87; Smith v. Tebbitt, 1 L. R. Probate, 398, and Coghlan's case, 19 Ves., 508.)

In the case before us, insanity either existed as a permanent, settled disease, its manifestations differing only in degree owing to circumstances and time; or it did not exist at all. Now, the defendant having introduced testimony tending to establish such insanity, and the State failing to show either a "lucid interval" or to negative the general insanity proved, can we do otherwise than decide that the verdict was contrary to the law and evidence, and that the defendant should have been granted a new trial? Again, to the proof of insanity during the defendant's past life, and the opinions of eminent physicians as to his continued mental unsoundness, was added the strong proof of hereditary insanity existing in the line of defendant's maternal ancestors. The value and weight of this fact is being every day more clearly recognized (Browne's Med. Jurisprudence of Insanity, secs. 42 and 525; Vol. 31, Journal of Insanity, 194, and 11 W. & S. Med. Jurisprudence, sec. 365); and yet in the case before us it was set aside and counted as naught by the jury, with no testimony to oppose it. Was this a decision founded upon the testimony and the law?

Calmly and carefully reviewing all the evidence before us on the question of insanity, its volume, clearness and source, can we feel the slightest doubt, even under the charge given by the court, that the jury was led by prejudice, passion, or fear, rather than by an earnest desire for justice, to render so inexplicable a verdict.

*Herring & Kelley, N. R. Lindsey, J. C. Jenkins* and *B. D. Shropshire* also filed an able brief and argument for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

White, Presiding Judge. Appellant was convicted of murder of the second degree for the killing of one J. N. Martin; his punishment being assessed at fourteen years in the penitentiary.

On the trial his defenses, in addition to the plea of not guilty, were, first, resistance to an unlawful arrest by an officer acting without authority of a warrant and when no offense had been committed by defendant, and, second, insanity.

Amongst the witnesses summoned by defendant were several medical experts whose testimony he proposed to use on the issue

of insanity. In placing the witnesses under "the rule,"which had been invoked preliminary to the introduction of the evidence, the court required the medical experts also to be placed under the rule with the other witnesses, over the protest of defendant, who insisted upon his right to have them remain in the court room so that they might hear all the testimony adduced on the plea of insanity, and be thereby the better enabled to express an opinion upon that issue.

Where "the rule" is invoked as to witnesses, the the mode and manner of its enforcement is confided largely to the discretion of the court, and the exercise of that discretion will not be revised except in clearest cases of abuse. (Kennedy v. The State, 19 Texas Ct. App., 620; Bond v. The State, 20 Texas Ct. App., 421; Posey's Texas Crim. Digest, pp. 611, 612.) No exception is provided by statute, exempting any particular class of witnesses from the operation of the rule. (Code Crim. Proc., Arts. 662 to 666.) Ordinarily witnesses who are summoned as experts are excepted from the rule, and in cases involving the question of insanity the better and more satisfactory practice would be to allow them to remain in the room and hear the testimony of all the other witnesses, in order that from the whole testimony they may be enabled to determine from the evidence itself the matter upon which their opinion is desired. (Johnson v. The State, 10 Texas Ct. App., 571.) Mr. Wharton states the rule otherwise, and holds that "when insanity is set up by a defendant and denied by the prosecution an expert can not be asked his opinion as to the evidence in the case as rendered, not only because this puts the expert in the place of the jury in determining as to the credibility of the facts in evidence, but because the assistance thus afforded is in most trials illusory, experts usually being in conflict, and the duty devolving on the court and jury of supervising the reasoning of experts being one which can rarely be escaped." (Whart. Cr. Evid., sec. 418.) This whole subject was fully discussed by us in Webb's case, 9 Texas Court of Appeals, 490, and upon a review of the authorities it was said that "as to medical experts, they may state their opinion upon the whole evidence if they have heard it all, or upon a hypothetical statement which is in conformity with the whole evidence. All authorities agree that it is inadmissible to permit an expert to give his opinion upon any thing short of the whole evidence in the case, whether he has personally heard it or it is stated to him hypothetically." (Citing Redfield's

addition to sec. 53, Greenl. on Evid.) Where the expert has not heard the evidence, each side has the right to an opinion from the witness upon any hypothesis reasonably consistent with the evidence, and; if meagerly presented in the examination on one side, it may be fully presented on the other; the whole examination being within the control of the court, whose duty it is to see that it is fairly and reasonably conducted. (Coyle v. The Com., 104 Pa. St., 117.)

In the case in hand it is not shown that the hypothetical method of obtaining the opinion of the experts was either defective in not submitting all the facts essential to an intelligent opinion, nor that the opinions were such as would have been given differently had the evidence been heard directly by these witnesses, and their conclusions drawn from it, and not from a hypothetical statement of it. We can not perceive that the discretion of the trial judge was abused in the matter to the prejudice of defendant.

Doctor D. R. Wallace, superintendent of the insane asylum at Terrell, Texas, qualified as an expert, and upon the hypothetical statements submitted to him, declared as his opinion that the defendant, at the time of the homicide, was suffering from recurrent insanity. He further stated, in effect, that had defendant been consigned as insane to his custody, at no time covered by the facts stated would he have felt authorized to release him as a sane man from the asylum.

Appellant's counsel asked this witness if he could give any illustrations of recurrent insanity which had come within his own personal experience. This testimony was objected to by the prosecution and excluded by the court. We have had no access to the authority (Lawson on Expert and Opin. Evid.) cited in support of the admissibility of the evidence in the brief of appellant's counsel. But, even if admissible, in our view of the case its exclusion could not materially affect defendant's rights, and the ruling would be error without prejudice, which is not reversible error. The general rule seems to be that " an expert may be asked by either party as to the reasons on which his opinion is based ; or he may, with leave of the court, give such explanation on his own account. Beyond this he can not go in such examination, though he may be examined in details in order to test his credibility and judgment." (What. Cr. Evid., 8 ed., sec. 419.)

Many objections are urged to the charge of the court upon the

question of insanity, and it is urgently insisted that it was error
to refuse defendant's special requested instructions upon the
subject. The chief objection is that the court did not instruct
the jury to the effect "that defendant would not be responsible
if he was overwhelmed by an impulse which took away his will
power and rendered him incapable of controlling his actions."
In effect the complaint is that the court did not sufficiently
charge upon moral insanity or irresistible and uncontrollable im-
pulse as excuses for crime. As given, the charge of the court
upon this branch is almost a literal copy of an approved charge
on insanity given in Willson's Criminal Forms (Form No. 716,
p. 335), and which is taken from the charge given the jury by
the Hon. John C. Robertson, presiding in the trial court in the
case of King v. The State, reported in 9 Texas Court of Ap-
peals, 515.

Different courts and different law writers have announced dif-
ferent tests of responsibility for crime where insanity was
claimed as a defense to its commission. Mr. Greenleaf's rule is
whether the accused was laboring under such defect of reason
from disease of the mind as not to know the nature or quality
of the act he was doing, or, if he did know it, that he did not
know that he was doing wrong—the party's knowledge of right
and wrong in respect to the very act with which he is charged.
(2 Greenlf. Evid., sec. 373.) And this seems the rule as recog-
nized in Texas in the early case of Carter v. The State, 12 Texas,
500, and also in Webb's case, 5 Texas Court of Appeals, 596;
Williams v. The State, 7 Texas Court of Appeals, 163; and Clark
v. The State, 8 Texas Court of Appeals, 350.

Mr. Taylor, in his celebrated work on medical jurisprudence,
speaking of moral insanity, says: "The law does not recognize
moral insanity as an independent state; hence however per-
verted the affections, moral feelings or sentiments may be, a
medical jurist must always look for some indications of dis-
turbed reason. Moral insanity is not admitted as a bar to re-
sponsibility for civil or criminal acts except in so far as it may
be accompanied by intellectual disturbance" (p. 780). From
the time of the decision in the noted McNaughten case (10 Cl. and
Fin., 200), the English courts have followed the doctrine as the
same is announced by Greenleaf, and they have refused to
recognize the coexistence of an impulse absolutely irresistible
with capacity to distinguish between right and wrong with
reference to the act, and in most of the American States the

test is still a knowledge of right and wrong. In his work on homicide Mr. Wharton says: "Irresistible impulse is not moral insanity, supposing moral insanity to consist of insanity of the moral system coexisting with mental sanity. Moral insanity, as thus defined, has no support either in psychology or law. Nor is irresistible impulse convertible with passionate propensity, no matter how strong in persons not insane. In other words, the irresistible impulse of the lunatic which confers irresponsibility is essentially distinct from the passion, however violent, of the sane, which does not confer irresponsibility." (Sec. 574.) A number of most respectable authorities deny that moral insanity has any place in law, and with regard to irresistible impulse they hold, "if it were irresistible the person accused is entitled to be acquitted, because the act was not voluntary and was not properly his act. If the impulse was resistible the fact that it proceeded from disease is no excuse at all." (Stephen's Cr. L., 91; 1 Whart. Cr. L., 8 ed., sec. 145; 8 Abb., N. Y., Pr., 57; 23 Ill., 283; 2 Brewst., Pa., 491; 23 Ohio St., 146; 13 Min., 341; 15 Wall., U. S., 580; 4 Pa. St., 264; DeJarnette v. The Com., 75 Va., 867; 4 Law Mag., p. 586.)

It is held in Oregon that if the accused knew enough to know the difference between right and wrong and that he was violating the law by the commission of the act, it will not excuse him although he had surrendered his judgment to some mad passion, which, for the time being, was exercising a strong influence over his conduct. (State v. Murray, reported in 6 Cr. L. Mag., 255.) Ungovernable passion is not insanity, and one whose power of will is not impaired by disease, and who, yielding to passion slays another, is subject to the punishment fixed by law. (Saunders v. The State, 94 Id., 147.)

It is said by the Supreme Court of Alabama: "There is a species of mental disorder, a good deal discussed in modern treatises, some times called 'irresistible impulse,' 'moral insanity,' and perhaps by some other names. If by these terms it is meant to affirm that a morbid state of the affections or passions, or an unseating of the moral system, the mental faculties remaining meanwhile in a normal sound condition, excuses acts otherwise criminal, we are not inclined to assent to the proposition. The senses and mental powers remaining unimpaired, that which is some times called moral or emotional insanity savors too much of a seared conscience or atrocious wickedness to be entertained as a legal defense. Gibson, C. J., in Commonwealth v. Mosher,

4 Barr (Pa.), 266, while recognizing the existence of moral or homicidal insanity as 'consisting of an irresistible inclination to kill or to commit some other particular offense,' adds: 'There may be an unseen ligament pressing on the mind, drawing it to consequences which it sees but can not avoid, and placing it under a coercion which, while its results are clearly perceived, is incapable of resistance.' With all respect for the great jurist who uttered this language, we submit if this is not almost if not quite the synonym of that highest evidence of murderous intent known to the common law, a heart totally depraved and fatally bent on mischief. Well might he add: 'The doctrine which acknowledges this mania is dangerous in its relations, and can be recognized only in the clearest cases. It ought to be shown to have been habitual, or at least to have evinced itself in more than a single instance. The frequency of this constitutional malady is fortunately small, and it is better to confine it within the strictest limits. If juries were to allow it as a general motive operating in cases of this character, its recognition would destroy social order as well as personal safety. To establish it as a justification in any particular case, it is necessary to show by clear proof either its contemporaneous existence evinced by present circumstances, or the existence of an habitual tendency developed in previous cases, becoming in itself a second nature.' What is meant by 'evincing itself in more than a single instance,' and how this principle would work in administration, we are left to speculate. Can that be sound legal principle whose general recognition would destroy social order as well as personal safety? We concur with Mr. Wharton (Howe, sec. 574), that moral insanity which consists of irresistible impulse coexisting with mental sanity "has no support either in psychology or law." (Boswell v. The State, 63 Ala., 307.)

And so in The People v. Horn, 62 California, 120, it is held that "an irresistible impulse to commit an act which one knows is wrong or unlawful, if it ever exists, does not constitute the insanity which is a legal defense. Whatever may be the abstract truth, the law never recognizes an impulse as uncontrollable which yet leaves the reasoning powers, including the capacity to appreciate the nature and quality of the particular act, unaffected by mental disease. It can not be said to be irresistible because not resisted." And in Wallace v. The People it is laid down that if an accused has sufficient reason to know right from wrong, it is immaterial whether he had sufficient

power of control to govern his actions. (26 How., New York, 67.)

But even in Pennsylvania the doctrine of uncontrollable impulse appears to have been greatly modified, if not repudiated entirely; for we find the Supreme Court of that State, in 1885, announcing, in The Commonwealth v. Taylor, that "moral insanity is not sufficient to constitute a defense unless it be shown that the propensities in question exist to such an extent as to subjugate the intellect, control the will, and render it impossible for the person to do otherwise than yield thereto. No mere moral obliquity of perception will protect a person from punishment for his act. The jury should be satisfied, with reference to the act in question, that his reason, conscience and judgment were so entirely perverted as to render the commission thereof a duty of overwhelming necessity." A man in the condition thus described would be unquestionably insane to all intents and purposes, in our opinion.

We deduce from the authorities, as a correct general conclusion, that the law does not require as the condition on which c riminal responsibility shall follow the commission of crime the possession of one's faculties in full vigor, or a mind unimpaired by disease or infirmity; that the mind may be weakened by disease, or impaired, and yet the accused be criminally responsible for his acts; that he can only discharge himself from responsibility by proving that his intellect was so disordered that he did not know the nature and quality of the act he was doing, and that it was an act which he ought not to do. But that if, on the other hand, he had sufficient intelligence to know what he was doing, and the will and the power to do or not to do it, he is, in contemplation of law, responsible for the act he has committed. (State v. Martin, N. J., reported in 3 Crim. Law Mag., 44; see also Dunn v. The People, 109 Ill., 635, and 1 Bish. Crim. L., sec. 391.)

But let us concede, for the sake of argument, that defendant was entitled in this case to have the doctrine of irresistible impulse and uncontrollable will given in charge to the jury, then we think it is manifest from the following extracts taken from the charge that the law was sufficiently given, and that defendant has no just ground of complaint in the matter. The jury were instructed: "A safe and reasonable test in all cases would be that whenever it should appear from all the evidence that, at the time of doing the act, the prisoner was not of sound mind, but was affected with insanity, and such affection was the effi-

cient cause of the act, and that he would not have done the act but for that affection, he ought to be acquitted. For in such a case reason would be at the time dethroned, and the power to exercise judgment would be wanting. But this unsoundness of mind or affection of insanity must be of such a degree as to *create an uncontrollable impulse to do the act charged*, by overriding the reason and judgment and obliterating the sense of right and wrong, and depriving the accused of the power of choosing between right and wrong as to the particular act done." This portion of the charge is a quotation from the opinion of Breese, J., in Hopps v. The People, 31 Illinois, 385. Again we copy from the charge: "If it is true that defendant took the life of deceased, and at the time the mental and physical machine had slipped from the control of defendant, *or if some controlling* mental or physical disease was in truth the acting power within him *which he could not resist*, and he was impelled without intent, reason or purpose, he would not be accountable to the law. If, on the other hand, he was of sound mind, capable of reasoning and knowing the act he was committing to be unlawful and wrong, and knowing the consequences of the act, *and had the mental power to resist and refrain from evil*, his plea of insanity would not avail him as a defense." And yet again the jury were told : "But if the mind was in a diseased and unsound state to such a high degree that for the time being *it overwhelmed the reason, conscience and judgment, and the defendant in committing the homicide acted from an irresistible and uncontrollable impulse*, it would be the act of the body without the concurrence of the mind. In such a case there would be wanting the necessary ingredient of every crime—the intent and purpose to commit it."

We are of opinion that the charge upon the general doctrine of insanity was sufficiently full, and that it amply submitted the question of irresistible impulse and uncontrollable passion, at least as far as we are willing to go in that direction, and therefore there was no error in refusing the special requested instructions.

But, again, it is insisted that the court erred in the refusal of defendant's special instruction to the effect that the law presumes insanity to continue after once shown to exist. In Webb's case, 5 Texas Court of Appeals, 596, this court quotes from Mr. Greenleaf that "if derangement or imbecility be proved or admitted at any particular period, it is presumed to continue

until disproved, unless the derangement was accidental, being caused by the violence of a disease. But this presumption is rather matter of fact than law, or at most, partly of law and partly of fact." (1 Greenl. Ev., sec. 42.)

Doctor Wallace's opinion was that defendant was a subject of "recurrent insanity." "Recurrent" means returning from time to time. Mr. Wharton lays it down as a rule that there is no presumption that fitful and exceptional attacks of insanity are continuous—a proposition manifest in itself. It is only insanity of a chronic or permanent character which, on being proved, is presumed to continue. (Whart. Cr. Ev., sec. 730.) On the other hand, the rule prevails that where an insane person has lucid intervals, the law presumes the offense of such person to have been committed in a lucid interval, unless it appears to have been committed in the time of his distemper. (1 Russ on Crimes, 9 ed., top p. 10, s. p. 11; 1 Hale, 33, 34.)

In an able article on "presumptions in criminal cases," published in the first volume Criminal Law Magazine, Doctor Wharton says: "Supposing, however, insanity has been proven to exist at a particular time, is it presumed to continue? So we have been some times told, but erroneously. Some diseases which are classed under the general category of insanity are undoubtedly chronic and permanent, and from them recovery is hopeless. From senile *dementia* and congenital idiocy there can be, as a rule, no recovery. There are few other forms of insanity of which recovery may not be predicated, at least as a contingency, and many forms of insanity, for example, puerperal and climacteric, arising from some peculiar transitional condition of the system, are notoriously temporary. It is a *petitio principii* to say that chronic insanity is presumed to continue; it is untrue to say that temporary insanity is to be considered as anything else than temporary. The fact is, there is no presumption of law whatever as to the continuance of disease of any kind. The question is one of experience, to be determined by the character of the disease, taken in connection with the character of the person in whom it acts." Aside from this, the burden is upon the defendant to show that he was insane at the time of and with regard to the particular act, and the presumption of sanity in temporary or recurrent insanity is against him, and must be overcome by him with a preponderance of evidence. (2 Bish. Cr. Proc., 674.) It was not error to refuse the special instruction upon this subject.

That portion of the charge relating to the authority and duty of a peace officer to arrest without warrant is also complained of. Such an arrest is allowed where an offense is committed in the presence or within view of the officer, if the offense is a felony or an "offense against the public peace." (Penal Code, Art. 226.) It is made a disturbance of the peace if one in a public place, street or highway, or near a private house, shall use loud and vociferous language or swear or curse in a manner calculated to disturb the inhabitants. (Penal Code, Art. 314; Acts Eighteenth Leg., Regular Sess., p. 12.) The court instructed the jury that the officer would have the right to arrest defendant without a warrant if the latter swore or cursed in the street or highway, or in a public place, in his presence. This charge was erroneous because to curse and swear in a public place, street or highway is not an offense unless done "in a manner calculated to disturb the inhabitants of such public place." (Art. 314.) Whilst a counter instruction was asked for defendant and refused, there is no bill of exception saved to either the charge given or that refused. One ground of the motion for a new trial is that the court erred in refusing instructions asked by defendant.

Our statutes make a difference in the practice with regard to charges in civil and criminal cases. In the former the charge is regarded as excepted to without the necessity of taking any bill of exceptions thereto. (Rev. Stat., Art. 1318; 2 Cond. Cases, Willson, secs. 135, 656), while in the latter it is expressly provided that if any of the eight provisions of the code with regard to the charge are disregarded "the judgment shall be reversed *if the error is excepted to at the time of the trial.*" (Code Crim. Proc., Art. 685; Clanton v. The State, 20 Texas Ct. App., 615, and authorities cited.) If no exception has been taken, then the question of the error in the charge may be raised on motion for a new trial, and a new trial shall be granted "where the court has misdirected the jury as to the law, or has committed any other material error calculated to injure the rights of the defendant." (Code Crim. Proc., Art. 777, subdivision 2.) It is a well settled rule that a charge of the court, when first questioned as to its correctness in the motion for new trial, will not be revised on appeal unless, when viewed in the light of the circumstances, it was calculated to prejudice the rights of the accused. (Hart v. The State, 21 Texas Ct. App., 163; Mendiola v. The State, 18 Texas Ct. App., 463; Lewis v. The State, 18 Texas Ct. App., 401;

Elam v. The State, 16 Texas Ct. App., 34; Gardner v. The State, 11 Texas Ct. App., 265; Mace v. The State, 9 Texas Ct. App., 110; Henry v. The State, 9 Texas Ct. App., 358.)

Applying these rules to the facts proven, we can not perceive that the error of the charge was calculated to injure defendant's rights. It is abundantly shown that he was cursing in a public place and handling, if not flourishing, a knife. The druggist in front of whose store he was cursing was disturbed, and asked the deceased as an officer to take defendant away from his house. Complained of for the first time on the motion for new trial, when considered in the light of these facts,. we must hold that the error in the charge was without prejudice.

Another objection is that the court in effect charged the jury that, when the facts have been proven which constitute the offense, it devolves upon the accused to establish the facts or circumstances on which he relies to justify or excuse the prohibited act. (Penal Code, Art. 51.) This identical question was raised in Jones v. The State, 13 Texas Court of Appeals, 1, and it was there held that "when an accused relies upon any substantive, distinct, separate and independent matter as a defense, which is outside of and does not necessarily constitute part of the act or transaction with which he is charged (such as the defense of insanity, etc.), then it devolves upon him to establish such special and foreign matter by a preponderance of evidence. It would not be error to instruct in such cases that the burden of proving such defenses devolved upon the accused." (Smith v. The State, 18 Texas Ct. App., 69; 7 Allen, Mass., 306; 62 Iowa, 414; 81 Kentucky, 662.)

The supplementary motion for new trial was properly overruled. "A new trial must be applied for within two days after the conviction; but for good cause shown, the court, in cases of felony, may allow the application to be made at any time before the adjournment of the term at which the conviction was had." (Code Crim. Proc., Art. 779; Hart v. The State, 21 Texas Ct. App., 163; Smith v. The State, 15 Texas Ct. App., 139; Bullock v. The State, 12 Texas Ct. App., 42; White v. The State, 10 Texas Ct. App., 167.) Appellant was convicted at one term and an appeal was taken; the appeal was dismissed and the motion was made at a subsequent term. That was not the term at which the conviction was had.

It only remains to pass upon the sufficiency of the evidence. It is true the medical expert, Doctor Wallace, thought the de-

fendant insane to the extent that he would not have released him from the asylum, if in his charge, during any portion of the time covered by the testimony. Other witnesses did not think him insane. "The proved existence of mental disease does not necessarily exempt a person from criminal responsibility." (Taylor's Med. Juris., p. 813.) When the issue is on trial in a court of law "it is not *medical* but *legal* insanity which is required to be proved on these occasions to the satisfaction of a jury." (Id., 834.) "An expert's conclusions do not bind them, and should they, upon the whole evidence, judge differently from him, their verdict is to follow not his opinion, but their own." (2 Bish. Cr. Proc., 3 ed., sec. 684.) In our opinion defendant's plea of insanity was certainly not clearly established, if, in fact, the evidence tended to establish it at all. To have made it available it should have been established by a preponderance of evidence to the satisfaction of the jury.

Because we have failed to find any reversible error in the record the judgment of the court below is in all things affirmed.

*Affirmed.*